Norah Hart, Esq.
Attorney for the Plaintiffs of the Putative Class
305 Broadway, 14th Floor
New York New York 10007
Telephone: (212) 897-5865
Facsimile: (646) 537-2662
E-mail nhart@consumerclasslaw.com
ATTORNEY FOR PUTATIVE PLAINTIFFS CLASS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HENRY GIFFORD, GIFFORD FUEL SAVING, INC., individually and on behalf of others similarly situated,<br><br>        Plaintiffs<br><br>        vs.<br><br>U.S. GREEN BUILDING COUNCIL, DAVID GOTTFRIED, RICHARD FEDRIZZI, ROB WATSON, JANE DOE, JOHN DOE ET AL.<br>        Defendants. | 10-cv-7747 LBS<br><br><br><br><br>COMPLAINT |

Plaintiffs, HENRY GIFFORD, GIFFORD FUEL SAVING, INC., individually and on behalf of all others similarly situated, sue U.S. GREEN BUILDING COUNCIL ("USGBC"), a Washington, D.C. based corporation, and allege as follows:

## INTRODUCTION

USGBC describes itself as a "community of leaders working to make green buildings available to everyone." USGBC's proprietary product line includes its L.E.E.D.® "green building certification system", L.E.E.D.® courses and workshops for professional accreditation, an annual Greenbuild® conference and exposition, and L.E.E.D.® project registration, certification and building plaques. USGBC's L.E.E.D.® rating system is supplanting building codes in many jurisdictions, undermining marketplace competition and obscuring other building

standards that *are* proven—unlike L.E.E.D.®—to reduce energy use and carbon emission (such as the U.S.D.O.E.'s Energy Star program, ASHRAE standards, Passivhaus/Passive House USA standards, Air Barrier Association of America standards, etc.).  USGBC addresses members of the building trade on its website: "As you may be aware, L.E.E.D.® is fast becoming the industry norm, and no matter what experience you have in the design and construction industry (and even if you have no experience whatsoever), you are making a wise decision for your career and for the environment."  Nothing could be further from the truth.  L.E.E.D.®-accredited professionals are often, and increasingly, people with "no experience whatsoever."  When L.E.E.D.®-accredited professionals design and build buildings instead of skilled professionals, such as the Plaintiffs, with years of experience making safe, comfortable, and energy-efficient environments, the marketplace, consumers, and the environment, often suffer.

## PARTIES

1.  Plaintiffs are consumers, taxpayers, and building design and construction professionals.

2.  At all times material hereto, Plaintiff, Henry Gifford (hereinafter "Gifford") was and is a permanent resident of New York, New York.  Gifford Fuel Saving, Inc. is a corporation registered in New York.  Vice Bailey (hereinafter "Bailey") was and is a permanent resident of Peoria, Arizona.

3.  At all times material hereto, Defendants were and are a corporation based in Washington, D.C. with offices at 1800 Massachusetts Avenue NW, Suite 300, Washington, D.C. 20036.

## JURISDICTION

4.  Pursuant to 28 U.S.C. § 1332(d), 1453, and 1711-1715, the Class Action Fairness Act of 2005, this Court has diversity jurisdiction in that there is minimal diversity, such that some Plaintiffs are citizens of different states from the defendants.

5.  Pursuant to 28 U.S.C. § 1332(d)(2)(A), this Court has original jurisdiction in that the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs.

6.  Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction in that this is a civil action arising under the laws of the United States.

7.  This action was filed in the United States District Court of the Southern District of New York on October 5, 2010.

## CLASS ALLEGATIONS

12. This civil action is brought as a class action on behalf of Plaintiffs and all others similarly
situated who comprise the following class or subclasses (the "Class"), defined as follows:

    a.  All persons (which term shall include incorporated entities) who paid for L.E.E.D.®-
certification for property they own in reliance on Defendants' deceptive marketing
claims that L.E.E.D.® -certified properties use 25% less energy and achieve $CO_2$
emissions reductions over non- L.E.E.D.®-certified properties as well as improved air
quality and improved water efficiency, false claims which deceive a substantial
segment of the market in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B);

    b.  All persons who design energy-efficient buildings and whose livelihoods are injured
by USGBC's monopolization of the market through fraudulent and intentionally
misleading representations in the marketing and promotion of their L.E.E.D.® product
line, including, but not limited to, false claims that L.E.E.D.®-certified buildings use
25% less energy and achieve $CO_2$ emissions reductions over non-L.E.E.D.® -certified
properties as well as improved air quality and improved water efficiency, false claims
intended to monopolize in violation of the Sherman Act 15 U.S.C. § 2;

    c. All taxpayers whose city and state tax dollars are spent on the costs of L.E.E.D.®
certification in publicly-commissioned buildings.  To make L.E.E.D.® even more
harmful to the marketplace and the environment, compliance with L.E.E.D.®'s
purported standards is not a requirement for L.E.E.D.® certification.  Verification of
energy usage, such as actual utility bills, by L.E.E.D.® buildings is neither required
for certification nor available from USGBC for evaluation.  Failure to comply with
L.E.E.D.® prerequisite standards is one of the many reasons why so many
L.E.E.D.® -certified buildings use more energy than they should based on the
predictions.  USGBC does not have the expertise to evaluate the facilities they certify
and does not require plans to be submitted or reviewed, essentially allowing building
designers to self-certify.

    d.  trades and are injured by USGBC's deceptive trade practices because they lose
money and valuable time to comply with L.E.E.D.® specifications and the buildings
they build do not use 25% less energy, or any less energy, than non-L.E.E.D.® -

certified properties.

e.  The Class Period is the period from March of 2008 to the time the original complaint was filed on June 22, 2010.

f.  Excluded from the Class are Defendants, employees and agents of the Defendants, members of the immediate family of the Defendants, any entity in which Defendants have a controlling interest, and Defendants' legal representatives, heirs, successors or assigns.

13. This action has been brought and is properly maintainable as a class action, pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), 23(b)(1), (2) or (3).

14. *Numerosity of the Class* – Fed. R. Civ. P. 23(a)(1). Although the exact number of class members cannot be ascertained, they are so numerous and geographically dispersed that joinder of all class members is impracticable. Upon information and belief there are millions of consumers, taxpayers, builders, homeowners, and building professionals who have relied, to their detriment, on the Defendant's misrepresentations. The precise number of Class members and their names and addresses is in the possession of the Defendant. As the misrepresentations alleged as the basis of this action were made primarily, if not exclusively, via the Internet, Class members may be notified of the pendency of this action by electronic mail, or U.S. mail, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

15. *Existence and Predominance of Common Questions of Fact and Law* — Fed. R. Civ. P. 23(a)(2), 23(b)(3). There are common questions of law and fact involved which predominate over any questions affecting only individual members of the class, including, but not limited to, the following:

a.  Whether members of the class were mislead by deception, negligent misrepresentations or concealment of material facts as a result of USGBC's public statements and press releases and other communications (such as USGBC's website).

b.  Whether Defendants actions are intended to garner a monopoly on the green building market through fraudulent misrepresentation of the truth, and whether said acts are likely to do so;

c.  Whether Defendants claims and material omissions constitute unfair competition;

d.  Whether Defendants claims and materials omissions are fraudulent or misrepresentations

of fact.

16. *Typicality* : Plaintiffs claims are typical of those of the Class in that Plaintiffs are members of the Class and have no known interest that are antagonistic to or contrary to the interest of the Class.

17. *Adequacy* : Plaintiffs will fairly and adequately protect the interest of the members of the class because their interests do not conflict with the interests of the Class members they seek to represent. Plaintiffs have retained competent representation that intends to prosecute this action vigorously.

18. *Superiority* : A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action which would preclude its maintenance as a class action. Furthermore, since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impracticable for the class members to seek redress individually for the wrongs they have suffered.

19. In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or Fed. R. Civ. P. 23(b)(2) because:

   a. the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant;

   b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

   c. Defendants have misrepresented fact and/or omitted material information in an identical way to the entire Class, thereby making it appropriate that injunctive relief is granted to the Class as a whole.

20. The following allegations are applicable to all members of the Class.

## GENERAL ALLEGATIONS
## ALLEGATIONS

21. The US Green Building Council (hereafter "USGBC") is a non-profit organization founded in 1993 by a real estate developer, Defendant David Gottfried, and a marketing executive, Defendant Richard Fedrizzi.

22. Defendant USGBC reported revenues of $64,000,000.00 in 2008.

23. In year 2000, USGBC trademarked the Leadership in Energy and Environmental Design rating system (hereinafter "L.E.E.D.®®").

24. Defendant Rob Watson developed the L.E.E.D.®® rating system for USGBC.

25. Until 2006 Defendant Mr. Watson was the Director of International Energy at the Natural Resources Defense Council (hereinafter NRDC).

26. NRDC is the nation's most recognized environmental action group.[1]

27. NRDC is a powerful environmental non-profit organization with over 350 lawyers, scientists, and policy experts.

28. The NRCD endorses L.E.E.D.®®.

29. The NRDC website proclaims "L.E.E.D.®® certification, which includes a rigorous third-party commissioning process, offers compelling proof to you, your clients, your peers, and the public at large that you've achieved your environmental goals and your building is performing as designed."[2]

30. NRDC promotes L.E.E.D.®®, "Achieving L.E.E.D.®® certification is the best way for you to demonstrate that your building project is truly "green.""[3]

31. The NRDC's "Building Green" page states "Use The L.E.E.D.®® Rating System As A Guide."[4]

32. The L.E.E.D.®® rating system is not based on objective scientific criteria, e.g. BTUs of energy consumed per square foot per year.

33. The L.E.E.D.®® rating system is not based on actual measurements but rather computer modeling of anticipated energy use levels of a building's performance in terms of energy use, air quality, toxicity of building materials, or any objective scientific criteria.

---

[1] http://www.nrdc.org/about/
[2] http://www.nrdc.org/buildinggreen/leed.asp
[3] http://www.nrdc.org/buildinggreen/leed.asp
[4] http://www.nrdc.org/buildinggreen/approach/goals.asp

34. The L.E.E.D.® ® rating system is based on a point system created by USGBC. To achieve the lowest level of certification, at least 40 points are required. The highest level requires 80 points.[5]

35. Under the current the L.E.E.D.® ® rating system guidelines, a bike rack earns one point, an electric vehicle charging station earns one point, installing a floor grate to trap debris earns one point, use of "non-emitting materials" for adhesive and sealants earns one point, use of "non-emitting materials" in paints and coating earns one point, use of "non-emitting materials" in flooring systems earns one point, and the hiring of a L.E.E.D.® ® accredited professional to prepare the certification application earns one point.[6]

36. Under the current the L.E.E.D.® ® rating system guidelines, a ten percent reduction in an existing building's heating and cooling earns two points.[7]

37. A building attains certification by submitting an application and supporting documentation to USGBC online at www.usgbc.org.

38. The minimum price for L.E.E.D.® ® certification is $2,900. Certification for a newly constructed building that is under 50,000 square feet is $2,000 for a USGBC member-organization plus an initial $900 "registration" fee per project. Certification for a newly constructed building that is over 500,000 square feet is $20,000 for a USGBC member-organization plus an initial $900 "registration" fee per project. Certification for a newly constructed building that is between 50,000 and 500,000 square feet is $.04 per square foot for a USGBC member-organization, plus an initial $900 "registration" fee, i.e. L.E.E.D.® certification for the White House in the capitol, a 55,000 square foot building, would cost $3,100.

39. In March of 2008, USGBC commissioned a study performed by the New Buildings Institute (hereinafter "the NBI study").

40. According to the NBI website, "The results [of the NBI study] look at the relationships of actual performance levels to other benchmarks, including initial modeling and Energy Star ratings."

41. The NBI study assembled building energy use data from 121 newly constructed L.E.E.D.® certified buildings across the country that had been occupied for at least one year.

---

[5] LEED Rating Systems; http://www.usgbc.org
[6] Ibid.
[7] Ibid.

42. USGBC claims that the NBI study showed that new buildings "certified under the U.S. Green Building Council's L.E.E.D.® certification system are, on average, performing 25-30% better than non-L.E.E.D.® certified buildings in terms of energy-use."[8]

43. In a press release issued April 3, 2008, USGBC proclaimed that, based on the NBI study results, L.E.E.D.® buildings are 25-30% more energy efficient than non-L.E.E.D.® buildings.[9]  (See Exhibit A.)

44. USGBC is fraudulently misleading the consumer by intentionally omitting material information, i.e. the fact that the NBI study sample was comprised of just 22% of L.E.E.D.® certified buildings, not all L.E.E.D.® certified buildings.  USGBC knowingly selected a skewed sample.  Letters were sent to representative of all 552 of the buildings that had been certified at the time of the NBI study.  Of the 252 respondents, only 121 submitted energy use data that NBI deemed sufficient to be included in the study.

45. USGBC is fraudulently misleading the consumer by intentionally omitting material information, i.e. the fact that less than half of L.E.E.D.® certified buildings responded to the survey, and half of those were eliminated from the sample.  Only those L.E.E.D.® certified buildings that employ someone authorized to complete the survey, and qualified to do so, submitted  energy-use data, any building with a motivated, competent and energy-educated management will be more likely to have energy efficient operations regardless of whether the building is L.E.E.D.® or not.

46. USGBC is fraudulently misleading the consumer by intentionally omitting material information, i.e. the fact that owners of L.E.E.D.® certified buildings have a vested interest in boosting the value of the L.E.E.D.® certification for which they paid a substantial premium.  A motive to distort the data should have been attributed to the survey respondents and methodologically corrected in order to produce accurate results.  The bias in the NBI study sample is so obvious, it is about as useful as studying blood alcohol levels of drivers who volunteer to be tested.  USGBC fraudulently misrepresented its findings, by failing to disclose these obvious sample flaws.

47.  USGBC is fraudulently misleading the consumer by concealing the material importance of the fact that the NBI study compared a set of *new* buildings to a set of *new and old* buildings.

[8] USGBC Press Release, Newly Released Studies Confirm Energy Savings Significant in LEED, ENERGY STAR Buildings, April 3, 2008.
[9] Ibid.

48. L.E.E.D.® buildings were compared in the NBI study to a database of 5,215 buildings maintained by the United States Energy Information Administration's Commercial Buildings Energy Consumption Survey's catalog (hereinafter "CBECS").[10] CBECS buildings date from as early as 1920. The L.E.E.D.® sample consists of buildings built or renovated after 2000. The energy use data of the L.E.E.D.® buildings reflect at least in part energy savings inherent in the post-2000 building practices and materials modern lighting fixtures, cooling equipment, insulation, etc., and are not necessarily attributable to L.E.E.D.® elements.

49. USGBC is fraudulently misleading the consumer by concealing the material importance of the fact that the NBI study compared the *median* energy use of the L.E.E.D.® buildings to the *mean* energy use of the CBECS buildings.

50. The CBECS records are based on *mean average* energy use per square foot, while the L.E.E.D.® records are based on the *median average*. Mean is a straight average, while median represents the number above which half of the group falls and below which half of the group falls.

51. Comparing the median energy use of the L.E.E.D.® buildings to the mean energy use of the CBECS buildings is a meaningless comparison.

52. Comparing the median energy use of the L.E.E.D.® buildings to the mean energy use of the CBECS buildings made the L.E.E.D.® buildings appear more energy efficient than they actually are.

53. Comparing the median energy use of the L.E.E.D.® buildings to the mean energy use of the CBECS buildings is fraudulently misrepresentative and is intended to mislead consumers.

54. When asked why the NBI study compared median to mean values rather than mean to mean values, an NBI analyst said, "(W)e did use the median in this data to avoid being skewed by the extreme results."[11]

55. USGBC fraudulently misrepresented the energy use in L.E.E.D.® certified buildings by presenting the median rather than the mean averages.

56. The "extreme results" that USGBC admits that it concealed show that L.E.E.D.® buildings use 29% more energy than CBECS buildings. When the mean value of L.E.E.D.® buildings

---

[10] United States Energy Information Administration, "Commercial Building Energy Consumption Survey, 2003." http://www.eia.doe.gov/emeu/cbecs/2003sample.html
[11] Audio CD of the November 2007 USGBC annual conference proceeding.

is compared to the mean value of CBECS buildings, L.E.E.D.® buildings perform worse than CBECS.

57. The NBI study measured the total number of BTUs of energy per square foot per year used by each building and determined that the L.E.E.D.® building sample had a median energy use index of 69[21], meaning that they use a total of 69,000 BTUs of energy per square foot per year. If all 121 L.E.E.D.® certified building had been included, i.e. if the mean average were calculated, it would show a mean average energy use value of 105, which is 29% higher than the mean average energy use of the CBECS.

58. When compared using objective scientific criteria, e.g. before and after comparisons, life-cycle analysis, or energy use data (rather than projections and models), L.E.E.D.® buildings perform worse than conventionally built buildings.

59. The Green Building Institute ("GBI") is an environmental building organization that has been acknowledged by ANSI as a national standards developer for buildings. GBI bases its building standards on life-cycle analysis.

60. Among the fraudulent claims USGBC makes in order to mislead the market, USGBC claims that the LEED system is "providing third-party verification that a building or community was designed and built using strategies aimed at improving performance across all the metrics that matter most: energy savings…"[12] This claim is false on its face in several ways: 1) L.E.E.D.® certification does not require any verification of the data submitted in certification applications and does not require actual energy use data at any stage; 2) L.E.E.D.® certification is not based on actual building performance data but rather on projected energy use; and 3) USGBC does not have the staff or expertise to evaluate these applications. Far from providing "verification" "that a building or community was designed and built using strategies aimed at improving performance", USGBC essentially allows applicants to self-certify.

61. In 2008, a group of Wisconsin residents sought a refund of the certification fees they paid for LEED Gold certification of a $28M high school built in Eagle River (Northland Pines High School). Northland Pines was heralded as the nation's first LEED Gold high school. People who served on the Northland Pines' building committee appealed the LEED certification after licensed engineers found complete failure to comply with LEED's own mandatory

---
[12]

energy and atmosphere quality standards. Their appeal was disregarded by USGBC. The appellants' Executive Summary reads:

> "Compliance with both ASHRAE Standards 62.1-1999 and ASHRAE Standard 90.1-1999 are mandatory prerequisites for any level of LEED certification, even a single instance of non-compliance with either Standard is, or should be, prima facie grounds for denial of certification at any level. A building could apply for Platinum Certification with more than 60 points and still not be certified at all if there is only one single case where either ASHRAE is not met...Remember that this appeal deals only with two of the 40 LEED points that were granted by USGBC. No attempt was made to determine whether there was compliance with the other 38 LEED points claimed. Not completely complying with all the LEED prerequisites is a plaque removal event. This experience makes it very clear that USGBC and or GBCI scrutiny of LEED applications is severely lacking. While some instances of non-compliance with LEED may be minor or innocent, it is abundantly obvious that the granting of LEED Certification at NPHS left a lot ot be desired...The violations of the LEED prerequisites in this building are numerous and are neither minor nor innocent. Unfortunately, most designers and owners are not inclined to dispute or question LEED Certification after it is granted, especially if it might reflect unfavorably on them."[13]

62. The Northland Pines appeal is best summed up by the public statement released by the appellants who served on the building committee:

> "On behalf of the taxpayers of Vilas County who would like to know with certainty whether they got what they paid for or not, we ask the engineering community to look at this file and tell us, did we miss something here? How can it be all right to certify a building that doesn't fully comply with the rules set forth by the body that is doing the certifications?"[14]

---

[13] Executive Summary in response to USGBC's refusal to repeal LEED Certification of Northland Pines, December 23, 2008, prepared by Lawrence G. Spielvogel, PE, ASHRAE, and Mark Lentz, PE.
[14] Appellants' Statement, June 5, 2010. *Green Real Estate Law Journal*, June 9, 2010.

63. L.E.E.D.® is a well-known and was called "the world's biggest green-building brand name," in an article printed in Fast Company, a magazine about entrepreneurship, on December 19, 2007, entitled *The Green Standard*, by author Anya Kamenetz.

64. L.E.E.D.® standards are now required or encouraged in 22 states and 75 municipalities including Seattle and Boston. New York State's DASNY, Dormitory Authority of the State of New York, requires L.E.E.D.® certification for every project. The General Services Administration and the Environmental Protection Agency have incorporated L.E.E.D.® into their building policies.

65. L.E.E.D.®-accredited professionals spend hundreds on items needed to pass the L.E.E.D.® exams, including USGBC L.E.E.D.® Green Associate Study Guide ($85 value) 141 pages, USGBC L.E.E.D.® Core Concepts Guide ($35 value) 75 pages, USGBC L.E.E.D.® AP Building Design + Construction Study Guide ($85 value) 240 pages, Green Building Design and Construction Reference Guide, 2009 Edition ($185 value) 645 pages, etc.

66. Upon information and belief, the L.E.E.D.® system is harmful to the environment because effective energy saving methods are ignored in favor of the postulated (not actual) energy savings promised by L.E.E.D.® promotional materials.

67. The foregoing examples of deception are not exhaustive. Due to the convoluted and multi-media form of the deception, and the use of technology to perpetrate the deception, discovery is necessary to uncover the full scope of the Defendants' deceptive practices.

FIRST CAUSE OF ACTION
(MONOPOLIZATION THROUGH FRAUD)
SHERMAN ANTI-TRUST ACT 15 U.S.C. § 2

68. Gifford and the Class hereby reallege and incorporate by reference the allegations or paragraphs 1 through 65 of this Complaint.

69. Anti-trust violations are enforceable by the state attorneys general as well as individuals injured by illegal monopolization who may bring a civil action under 15 U.S.C.A. § 4 (except in Arkansas where only the attorney general may enforce the Sherman Act). The Sherman Anti-Trust Act Act, Section 1, reads: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be

deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

70. USGBC claims on its website that the LEED system is "providing third-party verification that a building or community was designed and built using strategies aimed at improving performance across all the metrics that matter most: energy savings…" [15]  This claim is false on its face in several ways: 1) L.E.E.D.® certification does *not* require any verification of the data submitted in certification applications; 2) L.E.E.D.® certification does *not* require actual energy use data at any stage; 3) L.E.E.D.® certification is *not* based on actual building performance data but rather on projected energy use; and 4) USGBC does not have the staff or expertise to evaluate these applications.  Far from providing "verification" "that a building or community was designed and built using strategies aimed at improving performance", USGBC essentially allows applicants to self-certify.  The design, building and performance of LEED buildings are not "verified" in any sense of the word.  Use of the term verification is false and intended to mislead the consumer and monopolize the market for energy-efficient building design.

69. USGBC omits material facts about the actual performance of L.E.E.D.® -certified buildings and promotes the fraudulently-biased results of the NBI study that compares the *median* energy use of the L.E.E.D.® buildings to the *mean* energy use of the CBECS buildings.

70. In a press release issued April 3, 2008, USGBC proclaimed that, based on the NBI study results, L.E.E.D.® buildings are "performing 25-30% better than non-L.E.E.D.® certified buildings."  This claim is another fraudulent misrepresentation intended to mislead the consumer and monopolize the market for energy-efficient building design.

71. USGBC's lies and omissions are likely to deceive its intended audience of stakeholders, i.e. building science professionals, real estate developers, homeowners, taxpayers, suppliers to the building industry, etc..

72. USGBC manipulated the NBI study data and continues to make fraudulent misrepresentations on its website, in the press, in the community of building professionals, in bad faith, knowingly and intentionally.

_____

[15]

73. USGBC continues to omit material facts and misrepresent the study results despite knowledge of, and circumspect acknowledgement of, the untruth of the NBI study.

74. The USGBC's misrepresentations are deceptive and intended to mislead consumers acting reasonably under the circumstances who materially rely on USGBC's fraudulent claims by paying to register projects as L.E.E.D.® projects, by paying certification fees for L.E.E.D.® certification, by hiring L.E.E.D.® accredited professionals to prepare applications for L.E.E.D.® certification, by expending valuable time and labor preparing applications for L.E.E.D.® certification, and/or paying to attain certification as L.E.E.D.® accredited professionals.

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, demand an injunction ordering USGBC to cease and desist its deceptive practices and demands judgment for statutory damages pursuant to the Sherman Act in the amount of $100,000,000, compensatory damages for consumers who were defrauded of the costs of L.E.E.D.® -certification and are thereby deprived of energy cost savings, and punitive damages as well as attorney's fees and costs, together with pre-judgment interest and demands trial by jury of all issues triable as of right by jury.

SECOND CAUSE OF ACTION

(UNFAIR COMPETITION)
LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B)

75. Gifford and the Class hereby reallege and incorporate by reference the allegations or paragraphs 1 through 74 of this Complaint.

76. The Lanham Act, Section 1125(a)(1)(B) was conceived to prevent deceptive marketing that is likely to deceive a substantial segment of the market. The statute reads: "Any person who, on or in connection with any goods or services, uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be

liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

77. In a press release issued April 3, 2008, USGBC proclaimed that L.E.E.D.® buildings are "performing 25-30% better than non-L.E.E.D.® certified buildings."

78. The claims made in the NBI study (as set forth in paragraphs 12 through 67 with the requisite specificity to allege fraud) are false on their face and are proof that USGBC intentionally defrauds the consumer and the marketplace.

71. Further fraudulent misrepresentation results from the fact that USGBC does not conduct site investigations of the buildings it certifies, nor does L.E.E.D.® require buildings to actually perform as promised as a condition of certification. In short, L.E.E.D.® certification is not what USGBC leads the consumer to believe it is. USGBC claims on its website that the LEED system is "providing third-party verification that a building or community was designed and built using strategies aimed at improving performance across all the metrics that matter most: energy savings…" [16] This claim is false on its face in several ways: 1) L.E.E.D.® certification does *not* require any verification of the data submitted in certification applications; 2) L.E.E.D.® certification does *not* require actual energy use data at any stage; 3) L.E.E.D.® certification is *not* based on actual building performance data but rather on projected energy use; and 4) USGBC does not have the staff or expertise to evaluate these applications. Far from providing "verification" "that a building or community was designed and built using strategies aimed at improving performance", USGBC essentially allows applicants to self-certify. The design, building and performance of LEED buildings are not "verified" in any sense of the word. Use of the term verification is false and intended to mislead the consumer and monopolize the market for energy-efficient building design.

79. False impressions about the value of L.E.E.D.® certification have influenced consumers in every segment of the market: to wit, a publicly traded real estate investment trust proclaims the following in its 2008 Securities and Exchange Commission 10-A filing: "Receiving L.E.E.D.® certification can provide building project owners with a number of benefits, including: higher lease rates; enhanced resale values; potential federal, state and local tax credits and incentives; and the ability to offer financial benefits to tenants, such as operating cost savings, improved worker productivity and health, and risk management benefits."

---

[16]

80. USGBC's misrepresentations are likely to deceive and do indeed deceive a substantial segment of the market.

81. USGBC's deception is material in that it is likely to influence consumers' purchasing decisions.

82. USGBC caused the statement to enter interstate commerce.

83. USGBC's deception results in actual or probable injury to the Classes.

84. USGBC is communicating false statements to consumers and potential customers, inter alia, the NBI study's findings vastly overstate the energy efficiency among buildings that were allegedly built in conformance with the L.E.E.D.® standard.

85. USGBC claims on its website that the LEED system is "providing third-party verification that a building or community was designed and built using strategies aimed at improving performance across all the metrics that matter most: energy savings…"[17] The design, building and performance of LEED buildings is not verified and this is a fraudulent misrepresentation intended to mislead the consumer and monopolize the market for energy-efficient building design. L.E.E.D.® certification does not require any verification of the data submitted in certification applications; and L.E.E.D.® certification is not based on actual building performance data but rather on projected energy use; and USGBC does not have the staff or expertise to evaluate these applications, far from providing "verification", USGBC essentially allows applicants to self-certify.

86. L.E.E.D.® certification is primarily designed to generate enormous profits for USGBC by requiring countless purchases from among USGBC's proprietary product line, which includes L.E.E.D.® certification fees, L.E.E.D.® building plaques, L.E.E.D.® project registration fees, L.E.E.D.® project application fees, L.E.E.D.® application preparation fees, USGBC membership fees, L.E.E.D.® professional accreditation fees, etc., not necessary to advocating a green building standard.

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, demand an injunction ordering USGBC to cease and desist its deceptive practices and demands judgment for statutory damages pursuant to the Lanham Act in the amount of $100,000,000, compensatory damages for consumers who were defrauded of the

---

[17]

costs of L.E.E.D.® -certification and are thereby deprived of energy cost savings, and punitive damages as well as attorney's fees and costs, together with pre-judgment interest and demands trial by jury of all issues triable as of right by jury.

## THIRD CAUSE OF ACTION

### DECEPTIVE TRADE PRACTICES
### New York State General Business Law § 349 (a) and §349 (h)

88. Pursuant to New York State General Business Law § 349 (a), deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state of New York are hereby declared unlawful.

89. Pursuant to New York State General Business Law § 349 (h), any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.

90. Gifford and the Class repeat and reallege the allegations contained above as if fully set forth herein.

91. In a press release issued April 3, 2008, USGBC proclaimed that, based on the NBI study results, L.E.E.D.® buildings are "performing 25-30% better than non-L.E.E.D.® certified buildings."

92. USGBC conceals from the consumer how the data it uses is deceptively presented (as set forth in pages 5 through 11 with the requisite specificity to allege fraud).

93. USGBC knowingly or recklessly makes the fraudulent misrepresentation that L.E.E.D.® buildings are "performing 25-30% better than non-L.E.E.D.® certified buildings in terms of energy-use."

94. USGBC deceptively conceals material facts discovered in the NBI study in violation of General Business Law § 350-a (1), omitting material facts about the study sample and the methodology.

95. The USGBC's misrepresentations are deceptive and intended to mislead consumers acting reasonably under the circumstances who, by paying to register projects as L.E.E.D.® projects, by paying certification fees for L.E.E.D.® certification, by hiring L.E.E.D.®

accredited professionals to prepare applications for L.E.E.D.® certification, by expending valuable time and labor preparing applications for L.E.E.D.® certification, and by paying to attain certification as L.E.E.D.® accredited professionals, materially rely on USGBC's fraudulent claims that USGBC are leaders in sustainable building science and that L.E.E.D.® -certified buildings save energy.

96. Consumers further rely on the appearance that L.E.E.D.® -certified buildings save energy.

97. Consumers further rely on USGBC's deceptive representations by accepting as true that L.E.E.D.® -certified buildings save energy.

98. These representations are unfair practices because they are unethical, unscrupulous and financially and personally injurious to construction professionals competing with USGBC's fraudulent practices, builders, owners, and consumer-homeowners who pay more to adhere to L.E.E.D.® requirements on the false promise of energy efficiency.

99. Gifford and the Class were and are being damaged by USGBC's representations to the extent, but not limited to, construction professionals losing market share to L.E.E.D.® -certified projects and builders, owners, and consumer-homeowners being defrauded of fees paid in reliance on USGBC's fraudulent promise of energy savings.

100.    Gifford and the Class have suffered damages as a direct and proximate result thereof.

101.    The allegations herein are violations of New York's GBL §349.


WHEREFORE, Plaintiffs seek: 1) to enjoin USGBC from claiming that L.E.E.D.® certified buildings "perform 25-30% better than non-L.E.E.D.® certified buildings" and from implying that energy use levels in L.E.E.D.® buildings is any better than that of non-L.E.E.D.® buildings; 2) to enjoin USGBC from calling itself "leaders in energy;" and 3) judgment against Defendant USGBC for statutory, compensatory, actual, and punitive damages; 4) attorney's fees and costs together with pre-judgment interest; and, trial by jury of all issues triable as of right by jury.


## FOURTH CAUSE OF ACTION

### FALSE ADVERTISING
#### New York State General Business Law § 350-a (1) and § 350-a (3)

102.   Pursuant to New York State General Business Law § 350-a (1), the term "false advertising" means advertising, including labeling, of a commodity, if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

103.   Pursuant to New York State General Business Law § 350-a (3), any person who has been injured by reason of any violation of § 350 or §350-a of this article may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney`s fees to a prevailing plaintiff.

104.   Pursuant to New York State General Business Law § 350, deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state of New York are hereby declared unlawful.

105.   Pursuant to New York State General Business Law § 350, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.

106.   Gifford repeats and realleges the allegations above as if fully set forth herein.

107.   USGBC fraudulently claims that "L.E.E.D.® certified buildings "perform 25-30% better than non-L.E.E.D.® certified buildings," and widely publicizes this falsity in press releases and in its website and its advertisements.

108.   USGBC knowingly misrepresents the results of the NBI study.

109.   These misrepresentations are deceptive and intended to mislead consumers acting reasonably under the circumstances who, by agreeing to pay the costs to certify buildings as L.E.E.D.® rated, materially rely on USGBC's claims.

110.   Consumers further rely on the promise that adhering to L.E.E.D.® rating system will save energy and result in lower energy use in their L.E.E.D.® certified building.

111.   These representations are unfair practices because they are unethical, unscrupulous and financially and personally injurious to consumers.

112.   Gifford and the Class were and are being misled by USGBC's representations to the extent, but not limited to, construction professionals losing market share to L.E.E.D.® - certified projects and builders, owners, and consumer-homeowners paying USGBC fees in reliance on USGBC's fraudulent promise of energy savings.

113.   Gifford and the Class have suffered damages as a direct and proximate result thereof.

114.   The allegations herein are violations of New York's GBL §350.


WHEREFORE, Plaintiffs seek 1) to enjoin USGBC from claiming that L.E.E.D.® certified buildings "perform 25-30% better than non-L.E.E.D.® certified buildings" and from implying that energy use levels in L.E.E.D.® buildings is any better than that of non-L.E.E.D.® buildings; 2) to enjoin USGBC from calling itself "leaders in energy;" and 3) judgment against Defendant USGBC for statutory, compensatory, actual, and punitive damages; 4) attorney's fees and costs together with pre-judgment interest; and, trial by jury of all issues triable as of right by jury.


FOURTH CAUSE OF ACTION

WIRE FRAUD
VIOLATIONS OF RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962 (C)

115.   Plaintiffs and other members of the Class repeat and re-allege each and every allegation set forth in paragraphs "1" through "114" as if fully set forth herein.

116.   This cause of action is brought against each of the Defendants on behalf of the Plaintiffs and the other members of the Class and arises under 18 U.S.C. §1962 (c) and (d) of RICO.

117.   Defendants David Gottfried, Richard Fedrizzi, Rob Watson, and Jane Doe, John Doe et al. are "persons," as that term is defined in 18 U.S.C. §1961 (3), which engage in, and the activities of which affect interstate commerce.

118. Defendant U.S. GREEN BUILDING COUNCIL and its affiliates and subsidiary businesses constitute an enterprise as that term is defined by 18 U.S.C. §1961 (4) (hereinafter the "L.E.E.D. Enterprise").

119. The L.E.E.D. Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

120. Defendants David Gottfried, Richard Fedrizzi, Rob Watson, and Jane Doe, John Doe et al. are associated with the "L.E.E.D. Enterprise.

121. As described herein, David Gottfried, Richard Fedrizzi, Rob Watson, and Jane Doe, John Doe et al. knowingly and intentionally devised a scheme of deception which had the specific intent and primary goal of employing fraudulent misrepresentations and unlawful deception to enrich Defendants at the expense of Plaintiffs and other members of the Class.

122. Defendants David Gottfried, Richard Fedrizzi, Rob Watson, and Jane Doe, John Doe et al., in furtherance of and for the purpose of executing the fraudulent scheme described herein, on millions of separate and distinct occasions used and caused to be used wire communications in interstate and foreign commerce by both making and causing to be made wire communications, thereby committing the predicate offense under § 1961 (1)(B) relating to wire fraud under 18 U.S.C. §1343.

123. Repeated use of a wire communication, on millions of separate and distinct occasions, in connection with such fraudulent scheme, constitutes racketeering activity as that term is defined in § 1961 (1)(B). The unlawful use of wire communications includes, but is not limited to, the collection of payments from subscribers through online payment systems, at times too numerous to identify and at times exclusively known by the Defendants, where such payments were obtained through fraudulent and deceptive statements and omissions about the LEED rating system.

124. Each of the Defendants engaged in a pattern of racketeering activity as defined by 18 U.S.C. §1961 in that they conspired to maintain a pattern and/or practice of selling LEED building certification and LEED AP accreditations based on fraudulent misrepresentations and defrauding consumers of their time, money, and efforts with the intent to increase their market share at the expense of Plaintiffs and the Class herein and to lure away these class members from hiring competitor environmental building consultants who provide similar services.

125.   Defendants' acts were neither isolated not sporadic but routine, interrelated and systematic, and caused substantial injury to Plaintiffs and other members of the Class, these acts constituted a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. §1961 (5). These predicate acts of racketeering activity were continuous and related to one another by virtue of common participants, to wit each of the Defendants; common victims; and the common purpose of utilizing the LEED Enterprise to defraud consumers and improperly enrich Defendants at the expense of the Plaintiffs and other members of the Class.

126.   Plaintiffs and other members of the Class suffered damages, which were the direct, foreseeable, and proximate result of the defendants' materially misleading acts and practices.

127.   Defendant's deceptive practices are likely to continue to deceive thousands of persons who will also be injured thereby.

128.   By virtue of the foregoing, Plaintiffs and the Members of the Class have been damaged, jointly and severally, for treble damages in the amount to be ascertained at trial.

WHEREFORE, Plaintiffs Henry Gifford and Gifford Fuel Savings, Inc., individually and on behalf of all others similarly situated, seek: 1) to enjoin USGBC from claiming that L.E.E.D.® certified buildings "perform 25-30% better than non-L.E.E.D.® certified buildings" and from implying that energy use levels in L.E.E.D.® buildings is any better than that of non-L.E.E.D.® buildings; 2) to enjoin USGBC from calling itself "leaders in energy;" and 3) judgment against Defendant USGBC for statutory, compensatory, actual, and punitive damages; 4) attorney's fees and costs together with pre-judgment interest; and, trial by jury of all issues triable as of right by jury.

## FIFTH CAUSE OF ACTION

## (UNJUST ENRICHMENT)

129.   The Class hereby realleges and incorporates by reference the allegations or paragraphs 1 through 128 of this Complaint.

130.    As a direct result of USGBC's wrongful acts, USGBC has been unjustly enriched at the expense of the Class.

131.    Under the circumstances described herein, it would be inequitable and unfair to allow USGBC to gain or profit from the fees it charges for its courses, workshops, conferences, or whenever buildings/ projects are registered and/or certified as L.E.E.D.®

132.    Under the circumstances described herein, it would be inequitable and unfair to allow USGBC to retain the benefit of its fraudulently-induced sales of building certifications when that certification does not even begin to deliver what USGBC promises it does.

133.    As a direct result of USGBC's conduct, acts or omissions, the Class is entitled to an award of restitutionary damages in an amount to be determined at trial.


WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, demand an injunction ordering USGBC and L.E.E.D.® to cease and desist its deceptive practices and demands judgment for compensatory, statutory and punitive damages as well as attorney's fees and costs, together with pre-judgment interest and demands trial by jury of all issues triable as of right by jury.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of others similarly situated, demand a trial by jury of all issues so triable as a matter of right.


DATED:  October 7, 2010

By:  _____

BY:
Norah Hart  (NH 5153)
Attorney for the Plaintiffs of the Putative Class
305 Broadway, 14th Floor
New York New York 10007
Tel: (212) 897-5865
Fax: (646) 537-2662
E-mail: nhart@consumerclass.law